**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SNOQUALMIE INDIAN TRIBE,
                    *Petitioner,*

STATE OF WASHINGTON DEPARTMENT
OF ECOLOGY,
                    *Intervenor,*

            v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent,*

PUGET SOUND ENERGY, INC.,
                    *Intervenor.*

No. 05-72739

FERC No.
2493-016

PUGET SOUND ENERGY, INC.,
                    *Petitioner,*

STATE OF WASHINGTON DEPARTMENT
OF ECOLOGY,
                    *Intervenor,*

            v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent,*

SNOQUALMIE INDIAN TRIBE,
                    *Intervenor.*

No. 05-74060

FERC No.
2493-027

OPINION

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

14233

Argued February 8, 2007
Submitted September 30, 2008
Seattle, Washington

Filed October 7, 2008

Before: Raymond C. Fisher and Richard C. Tallman,
Circuit Judges, and David A. Ezra,* District Judge.

Opinion by Judge Tallman

*The Honorable David A. Ezra, United States District Judge for the
District of Hawaii, sitting by designation.

## COUNSEL

Andrea Rodgers, Charles M. Tebbutt, Western Environmental Law Center, Eugene, Oregon, for petitioner Snoqualmie Indian Tribe.

Mark W. Schneider, Markham A. Quehrn, and Kristine R. Wilson, Perkins Coie LLP, Bellevue, Washington, for petitioner/intervenor Puget Sound Energy, Inc.

John S. Moot, Robert H. Solomon, Michael E. Kaufmann, Washington, D.C., for respondent Federal Energy Regulatory Commission.

Rob McKenna, Joan M. Marchioro, Olympia, Washington, for intervenor Washington Department of Ecology.

Michael W. Gendler, Gendler & Mann LLP, Seattle, Washington, for amici curiae Washington Association of Churches, the Church Council of Greater Seattle, and the Lutheran Public Policy Office of Washington State.

Harold S. Shepherd, Clinton, Colorado, for amicus curiae Center for Water Advocacy.

---

## OPINION

TALLMAN, Circuit Judge:

The Snoqualmie Tribe petitions for review of a decision of the Federal Energy Regulatory Commission ("FERC") granting Puget Sound Energy, Inc. ("PSE") a license to operate for another forty years the Snoqualmie Falls Hydroelectric Project. The Tribe argues that FERC's relicensing decision violates the Religious Freedom Restoration Act ("RFRA") because FERC employed the wrong legal standard for reviewing claims under RFRA and because substantial evidence does not support FERC's conclusion that the relicensing decision does not substantially burden the Tribe's free exercise of religion. The Tribe also asserts that FERC failed to consult with the Tribe on a government-to-government basis in violation of the National Historic Preservation Act ("NHPA"). PSE cross-petitions for review of FERC's decision to impose water flow requirements that exceed those established in the Washington State Department of Ecology's ("Ecology") water quality certification ("WQC").

We have jurisdiction under 16 U.S.C. § 825*l*(b). After hearing argument in this appeal, we vacated submission pending publication of *Navajo Nation v. U.S. Forest Serv.*, No. 06-15371, 535 F.3d 1058, slip op. 10033 (9th Cir. filed Aug. 8, 2008) (en banc). In reliance on that opinion, we now issue our decision in this case. We deny the petitions for review.

First, substantial evidence supports FERC's finding that the relicensing decision does not substantially burden the Tribe's free exercise of religion. Second, we conclude that, although FERC employed the wrong standard for analyzing RFRA claims, this error was harmless because FERC's standard was more generous to plaintiffs than the standard we have now articulated in *Navajo Nation* and the Tribe has failed to demonstrate a substantial burden that would meet the *Navajo Nation* standard. Third, because the record for purposes of NHPA § 106 consultation closed in 1997—before the Tribe gained federal recognition in 1999—FERC was not obligated to consult with the Tribe on a government-to-government basis. Finally, FERC's amendment of the license order's minimum instream flow provisions did not conflict with the conditions in Ecology's WQC and was supported by substantial evidence.

I

Snoqualmie Falls is a 268-foot waterfall about thirty miles east of Seattle on the Snoqualmie River as it flows down from the Cascade Mountains. If the Snoqualmie River flowed freely over the Falls, water flows in years of normal rainfall would exceed 1000 cubic feet per second ("cfs") eighty percent of the time.

Puget Sound Power and Light, predecessor to PSE, constructed a hydroelectric power plant at the Falls in 1898. The Federal Power Commission issued a license for the project in 1975. *Puget Sound Power & Light Co.*, 53 F.P.C. 1657 (1975), 54 F.P.C. 157 (1975), 54 F.P.C. 599 (1975). The project consists of a low-level diversion dam located upstream from the Falls, an underground power plant, and an above-ground power plant downstream of the Falls, with a total generating capacity of 44.4 megawatts. Electricity produced by the project annually averages about 273,000 megawatt hours, depending upon rainfall. The 1975 license mandated that PSE

maintain an instream flow of 100 cfs over the Falls during daylight hours.

The Falls is considered a sacred site by the few hundred enrolled members who today comprise the Snoqualmie Tribe. The Falls plays a central role in the Tribe's creation story and is an important location for its religious practices. The Tribe believes that the mist generated by the Falls connects the earth to the heavens and that a powerful water spirit lives in the plunge pool below the Falls. A 1993 article co-authored by anthropologist Kenneth Tollefson and sociologist Martin Abbott found that "[t]he Falls provides a place for contemporary Snoqualmie to gather to pray, to meditate, to worship, and to renew their contact with their ancestors and their spiritual powers." The Tribe performs religious ceremonies at the Falls, including "vision quests," often multi-day events in which individual tribal members seek spiritual contact through meditation, fasting, and bathing in the water below the Falls. The Falls has been designated as eligible for listing on the National Register of Historic Places as a Traditional Cultural Property.

On November 25, 1991, PSE filed an application with FERC for the relicensing of its hydroelectric project pursuant to the Federal Power Act, 16 U.S.C. §§ 791-828c. As required by the Clean Water Act, 33 U.S.C. §§ 1251-1387 ("CWA"), PSE also requested a WQC from the Department of Ecology. Ecology issued a WQC for the project on September 24, 2003. The WQC specified minimum water flows over the Falls, ramping rates, and water quality monitoring.

In evaluating PSE's license application, FERC considered several alternatives, including the proposed action (PSE's proposal to increase water diversion by an additional 1,500 cfs and to make major structural modifications), a minor upgrade (refurbishment of the existing project and a substantial increase in flows), and the Tribe's preferred alternative (decommissioning the entire project). FERC took the middle

ground and ultimately recommended and licensed the minor upgrade.

As part of the NHPA § 106 process, PSE prepared and submitted a Cultural Resources Mitigation and Management Plan ("Cultural Plan") and a Historical Resources Mitigation and Management Plan ("Historical Plan") on February 26, 1996. On December 19, 1996, FERC filed a letter requesting the Advisory Council on Historic Preservation to sign the Programmatic Agreement, which implemented these plans, and indicated that the requirements of § 106 had been satisfied. On January 22, 1997, the Advisory Council signed the Programmatic Agreement, thus closing the record for purposes of NHPA § 106. The Snoqualmie Tribe did not achieve federal recognition until October 6, 1999. *See* Final Determination To Acknowledge the Snoqualmie Tribal Organization, 62 Fed. Reg. 45,864 (Aug. 29, 1997).

On June 29, 2004, FERC issued an order relicensing the project (the "License Order"). As required by § 401 of the CWA, 33 U.S.C. § 1341(d), FERC made compliance with the WQC a condition of the license. In the License Order, FERC adopted the minimum water flows established in the WQC except for requiring greater water flows during Labor Day weekend. The resulting mandated minimum flows, as set forth in Article 21 and Appendix A, were as follows: May 16-31: 200 cfs at all times; June 1-30: 450 cfs at all times; July 1-August 31: 100 cfs during daytime and 25 cfs during nighttime (except weekends and holidays, which require 200 cfs at all times); September 1-May 15: 100 cfs during daytime and 25 cfs during nighttime (except Labor Day weekend, which requires 200 cfs during daytime).

On July 29, 2004, the Tribe filed a request for rehearing and stay of the License Order. On August 30, 2004, FERC temporarily granted rehearing for further consideration. On March 1, 2005, FERC issued an order partially granting and partially denying the Tribe's request and denying a stay (the

"First Rehearing Order"). FERC revised Article 421 of the License to require 1000 cfs at all times during May and June, thus conforming the License to the higher minimum daytime flows recommended by FERC staff in the final Environmental Impact Statement ("EIS"). On April 28, 2005, the Tribe petitioned us to review the First Rehearing Order.

On March 31, 2005, PSE requested that FERC rehear the First Rehearing Order pursuant to 16 U.S.C. § 825*l*(a). On June 1, 2005, FERC issued an order denying PSE's request for rehearing (the "Second Rehearing Order"). On July 8, 2005, PSE petitioned for review of the Second Rehearing Order.

We granted PSE's and the Tribe's motions to intervene in the petition for review proceedings. The Washington Department of Ecology was also granted intervention. We granted the parties' joint motion to consolidate the proceedings. This consolidated appeal challenges the Licensing Order, First Rehearing Order, and Second Rehearing Order (collectively, the "relicensing decision").

II

Under the Administrative Procedure Act, agency decisions may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *United States v. Bean*, 537 U.S. 71, 77 (2002); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004). An agency's decision can be upheld only on the basis of the reasoning in that decision. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997). We may reverse under the arbitrary and capricious standard if the agency relied on factors that Congress did not intend it to consider, or offered an explanation for its decision that runs counter to the evidence or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise. *Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir. 2003), *amended by* 352 F.3d 1186 (9th Cir. 2003).

Under the Federal Power Act, "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. § 825*l*(b); *Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027, 1045 (9th Cir. 2006). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1076 (9th Cir. 2003) (quoting *Eichler v. SEC*, 757 F.2d 1066, 1069 (9th Cir. 1985)). If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the agency. *See id.* Where, as here, "a court reviews an agency action 'involv[ing] primarily issues of fact,' and where 'analysis of the relevant documents requires a high level of technical expertise,' we must 'defer to the informed discretion of the responsible federal agencies.' " *Sierra Club*, 346 F.3d at 961 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989)); *see also Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008).

An agency's interpretation or application of a statute is a question of law reviewed *de novo*. *Schneider v. Chertoff*, 450 F.3d 944, 952 (9th Cir. 2006). When a statute is silent or ambiguous on a particular point, the court may defer to the agency's interpretation if based on a permissible construction of the statute. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Espejo v. INS*, 311 F.3d 976, 978 (9th Cir. 2002).

## III

**[1]** RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental

interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). This statute was Congress's response to a First Amendment decision of the Supreme Court that, in Congress's view, "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." *Id.* § 2000bb(a)(4). RFRA restores the compelling interest test set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and "guarantee[s] its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1); *see also Navajo Nation*, 535 F.3d at __ , slip op. at 10051.

The Tribe contends that FERC violated RFRA by employing the wrong definition of substantial burden when issuing the First Rehearing Order and License Order.[1] The Tribe also argues that FERC's ultimate conclusion that the hydroelectric project does not substantially burden the Tribe's religious exercise is not supported by substantial evidence because the continued operation of the hydroelectric project prevents the Tribe from having necessary religious experiences in three ways: its operation deprives the Tribe of access to the Falls for vision quests and other religious experiences, eliminates the mist necessary for the Tribe's religious experiences, and alters the ancient sacred cycle of water flowing over the Falls.

---

[1]The Tribe and Amici also argue that FERC conflated the requirements of the Free Exercise Clause of the First Amendment with those of RFRA through its reliance on *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988). But, in its License Order, FERC only cited to *Lyng* in a footnote immediately following a sentence solely addressing the Tribe's First Amendment claim. Similarly, in the First Rehearing Order, FERC addressed *Lyng* only in the context of the Tribe's First Amendment claim. Because the Tribe did not raise a First Amendment challenge before us, we need not assess FERC's application of the First Amendment or, within that context, *Lyng*. *See Guam v. Guerrero*, 290 F.3d 1210, 1215-19, 1222-23 (9th Cir. 2002) (differentiating between protection afforded by, and standards under, the Free Exercise Clause of the First Amendment and RFRA).

In our recent en banc decision in *Navajo Nation*, we reconsidered what constitutes a substantial burden under RFRA, adopting a narrower definition of that term than we had in prior decisions. There, the plaintiff tribe challenged the federal government's approval of the use for skiing of artificial snow containing recycled wastewater of which 0.0001% was comprised of human waste. The tribe asserted that use of the artificial snow on a mountain it considered sacred "desecrates the entire mountain, deprecates [its] religious ceremonies, and injures [its] religious sensibilities." 535 F.3d at ___, slip op. at 10040.

**[2]** We disagreed. Central to resolution of that case was whether use of the recycled wastewater imposed a substantial burden on the plaintiff tribe's exercise of its religion. We reiterated congressional intent to "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963)[,] and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)[,] and to guarantee its application in all cases where free exercise of religion is substantially burdened." *Navajo Nation*, 535 F.3d at ___, slip op. at 10051 (quoting 42 U.S.C. § 2000bb(b)(1)). Plainly, Congress intended that for RFRA to apply, a government enactment first *burden* the exercise of religion and then do so *substantially*. We emphasized that "the government is not required to prove a compelling interest for its action or that its action involves the least restrictive means to achieve its purpose, *unless* the plaintiff first proves the government action substantially burdens his exercise of religion." *Id.* (emphasis added).

**[3]** The term "substantial burden," as used in RFRA, "expressly adopted and restored . . . *Sherbert*, *Yoder*, and federal court rulings," *Id.* at ___, slip op. at 10052, as "a workable test for striking sensible balances between religious liberty and competing governmental interests." *Id.* at ___, slip op. at 10051 (quoting 42 U.S.C. § 2000bb(a)(5)). These cases led us to conclude:

Under RFRA, a "substantial burden" is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or [are] coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*).

*Id.* at ___, slip op. at 10053.

Thus, when "[a]pplying *Sherbert* and *Yoder*," we concluded "there is no 'substantial burden' on the [plaintiff tribe's] exercise of religion in this case." *Id.*

The use of recycled wastewater on a ski area that covers one percent of the Peaks does not force the Plaintiffs to choose between following the tenets of their religion and receiving a governmental benefit, as in *Sherbert*. The use of recycled wastewater to make artificial snow also does not coerce the Plaintiffs to act contrary to their religion under the threat of civil or criminal sanctions, as in *Yoder*. The Plaintiffs are not fined or penalized in any way for practicing their religion on the Peaks or on the Snowbowl. Quite the contrary: the Forest Service "has guaranteed that religious practitioners would still have access to the Snowbowl" and the rest of the Peaks for religious purposes.

The only effect of the proposed upgrades is on the Plaintiffs' subjective, emotional religious experience. That is, the presence of recycled wastewater on the Peaks is offensive to the Plaintiffs' religious sensibilities. To plaintiffs, it will spiritually desecrate a sacred mountain and will decrease the spiritual fulfillment they get from practicing their religion on the mountain. Nevertheless, under Supreme Court precedent, the diminishment of spiritual fulfillment—

serious though it may be—is not a "substantial burden" on the free exercise of religion.

*Id.* at ___, slip op. at 10053-54 (internal citation omitted).

**[4]** *Navajo Nation* is dispositive here. The Tribe's arguments that the dam interferes with the ability of tribal members to practice religion are irrelevant to whether the hydroelectric project either forces them to choose between practicing their religion and receiving a government benefit or coerces them into a Catch-22 situation: exercise of their religion under fear of civil or criminal sanction. After reviewing the voluminous record in this case, we have not found any evidence demonstrating that Snoqualmie Tribe members will lose a government benefit or face criminal or civil sanctions for practicing their religion. We therefore hold that substantial evidence supports FERC's decision relicensing the project and that it does not impose a substantial burden under RFRA on the tribal members' ability to exercise their religion, as we have defined substantial burden in *Navajo Nation*.

**[5]** In light of *Navajo Nation*, the Tribe's argument that FERC violated RFRA fails because, although it did not have the benefit of our recent en banc decision to guide it, the standard FERC applied, though erroneous in hindsight, was more favorable to the Tribe, and thus any error was harmless. In the License Order,[2] FERC stated:

> [RFRA] appears to apply to situations in which the Government has either prohibited an individual's religious practice or required an individual to take some action contrary to his or her religion [Fn. 41]—not to situations in which the Government took some

---

[2]In the First Rehearing Order, FERC did not reiterate its standard for evaluating the Tribe's RFRA claim, most likely because the Tribe did not clearly challenge FERC's elucidation of the RFRA standard in its Request for Rehearing.

action which incidentally affected the quality of an individual's religious experience. [Fn. 42] The issuance of a new license will not require the Snoqualmie to violate their religious beliefs. Nor does it prohibit or prevent the Snoqualmies' access to Snoqualmie Falls, their possession and use of religious objects, or the performance of religious ceremonies.

Footnote 41 of the Order notes that "[RFRA] states that Federal activities which inhibit the free exercise of any religion must satisfy a compelling Government interest and must be the least restrictive means to accomplish the purpose." Footnote 42 cites to *Sherbert*, 374 U.S. 398, and *Yoder*, 406 U.S. 205, "whose compelling interest test [RFRA] was intended to restore."

[6] Even if FERC's definition of substantial burden in its License Order comported with our elucidation of what a religious adherent must prove to establish a RFRA violation at the time FERC issued the License Order, its articulation of the substantial burden test is inconsistent with our definition of that term in *Navajo Nation*. However, as should now be clear, any error was harmless because the Tribe has not provided evidence that the dam project imposes a substantial burden on its members' religious exercise under the *Navajo Nation* clarification of the substantial burden standard.[3]

---

[3]As an additional matter, the Tribe and Amici argue that FERC's statement that RFRA does not apply "to situations in which the Government took some action which incidentally affected the quality of an individual's religious experience," equates to a finding that incidental burdens arising out of neutral and generally applicable laws never require more than rational basis scrutiny. But FERC did not say that RFRA never applies to any law of general applicability; rather, it indicated that RFRA does not prohibit the government from taking an action "which incidentally affected the *quality* of an individual's religious experience." That statement is consistent with our conclusion in *Navajo Nation* that RFRA does not prohibit a law of general applicability that merely diminishes the *quality* of an individual's religious experience, so long as the law does not force religious adherents to choose between following the tenets of their religion and receiving governmental benefits or coerce them to act contrary to their religious beliefs by the threat of civil or criminal sanction. *See Navajo Nation*, 535 F.3d at ___, slip op. at 10053.

IV

**[7]** The Tribe argues that FERC failed to engage in government-to-government consultation with the Tribe as required by NHPA and its own regulations.[4] Section 106 of NHPA, 16 U.S.C. § 470f, requires FERC to consider any effects of the project upon the Falls, a Traditional Cultural Property eligible for listing in the National Register of Historic Places. Section 106 and its accompanying regulations, 36 C.F.R. Part 800, require government-to-government consultation with federally recognized tribes. *See* 36 C.F.R. §§ 800.2(c)(2) (designating tribes as consulting party), 800.4 (regarding identification of historic properties), 800.5(a), (c)(2)(iii) (regarding assessment of adverse effects), 800.6 (regarding resolution of adverse effects), 800.14(f) (regarding generation of programmatic agreement); *see also id*. § 800.8 (regarding coordination with NEPA). In addition, in 2003 FERC promulgated a Policy Statement on Consultation with Indian Tribes in Commission Proceedings, 18 C.F.R. § 2.1c, which elucidates the meaning of "government-to-government" consultation.

**[8]** The Tribe achieved federal recognition on October 6, 1999, more than two years after the finalization of the key documents generated pursuant to § 106 of NHPA: the Cultural Plan, the Historical Plan, and the Programmatic Agreement. On December 19, 1996, FERC filed a letter requesting the Advisory Council on Historic Preservation to sign the Programmatic Agreement, which incorporated the Cultural and

---

[4]In its opening brief, the Tribe alleges that FERC's failure to engage in government-to-government consultation amounts to a violation of (1) the American Indian Religious Freedom Act ("AIRFA"), 42 U.S.C. § 1996, and (2) Bulletin 38, *see* Patricia L. Parker & Thomas F. King, U.S. Dep't of the Interior, National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties (1990). The Tribe did not challenge FERC's degree of tribal consultation under AIRFA or Bulletin 38 in its Request for Rehearing, however, so we lack jurisdiction to review these claims. *See* 16 U.S.C. § 825*l*(b).

Historical Plans, and indicated that the requirements of § 106 had been satisfied. On January 22, 1997, the Advisory Council signed the Programmatic Agreement, thus closing the record for purposes of NHPA § 106. *See* 36 C.F.R. § 800.14(b)(2)(iii) ("The programmatic agreement shall take effect when executed by the Council . . . . Compliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement until it expires or is terminated . . . ."). When the record was closed, the Tribe was not federally recognized. Therefore, NHPA § 106 did not require FERC to consult with the Tribe on a government-to-government basis. *See id.* § 800.16(m) (definition of "Indian tribe").

**[9]** Thus, we reject the Tribe's claim that FERC did not engage in meaningful tribal consultation pursuant to NHPA § 106. Because the Snoqualmie Indians were not federally recognized before the closure of the administrative record, we need not evaluate the sufficiency of FERC's government-to-government consultation efforts or reach the Tribe's claim that FERC cannot delegate its tribal consultation obligations to PSE.

## V

In its cross-petition for rehearing, PSE argues that FERC's amendment of the WQC stream flows in the First Rehearing Order denigrates the "beneficial use" of hydroelectric power production and in so doing violates the CWA. PSE also argues that FERC acted without substantial evidence in amending the flow requirements. Neither of PSE's arguments has merit.

## A

**[10]** As a preliminary matter, FERC asserts that PSE lacks standing to challenge the revised flow requirements, because

PSE's grievance—largely economic—is not within the "zone of interests" protected by the CWA. However, PSE is the party directly subject to the FERC action in question. As the applicant for the license under consideration, PSE holds an evident interest in the action. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987) ("*In cases where the plaintiff is not itself the subject of the contested regulatory action*, the [zone of interest] test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." (emphasis added)); *Stock West Corp. v. Lujan*, 982 F.2d 1389, 1397 (9th Cir. 1993) ("[W]hen a party *is* subject to the regulatory action, we believe that only an *explicit* declaration of Congress barring judicial review could overcome Congress' evident intent to make agency action presumptively reviewable." (internal quotation omitted)). Therefore, we hold that PSE possesses standing to challenge the relicensing of its hydroelectric project.

## B

PSE argues that FERC's 2005 revised license unlawfully adopts an aesthetic accommodation that alters the project's flow restrictions in conflict with Ecology's WQC. PSE asserts that, under the CWA, FERC is required to incorporate a state's WQC—without revision—into a license order, and that, by requiring increased flow conditions, FERC has degraded the existing beneficial use of hydropower production. We disagree.

Pursuant to CWA § 401, 33 U.S.C. § 1341, states establish the minimum water quality protections for projects requiring a federal license to discharge into navigable waters. *See also* 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ."). One aspect of water quality protection is an antidegra-

dation policy. *See* 40 C.F.R. § 131.12. While the term "antide-gradation" is not defined within the CWA, the policy's purpose is that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." *Id.* § 131.12(a)(1). State water quality standards must at least meet these conditions, but may be more stringent. *See* 33 U.S.C. §§ 1311(b)(1)(C), 1370; *see also* 40 C.F.R. § 131.4(a) ("As recognized by section 510 of the Clean Water Act [33 U.S.C. § 1370], States may develop water quality standards more stringent than required by this regulation.").

In accordance with the CWA mandate, Washington State—through its Department of Ecology—developed comprehensive water quality standards to regulate all of the State's navigable waters. *See* Wash. Admin. Code 173-201A (1997). Upon approval by the EPA, the Washington standard became "the water quality standard for the applicable waters of that State." 33 U.S.C. § 1313(c)(3); *see also Port of Seattle v. Pollution Control Hearings Bd.*, 90 P.3d 659, 671 n.6 (Wash. 2004). Washington's antidegradation policy effective at the time of FERC's 2005 revised license to PSE provided that "[e]xisting beneficial uses shall be maintained and protected and no further degradation which would interfere with or become injurious to existing beneficial uses shall be allowed." Wash. Admin. Code 173-201A-070(1).

To renew its FERC license for operation of its hydroelectric project, PSE sought and obtained a WQC from the state certifying agency, Ecology. *See* 33 U.S.C. § 1341(a)(1); *see also* 40 C.F.R. § 121.1(e). Ecology issued a WQC establishing conditions that PSE's hydroelectric plant must meet so as not to degrade water quality and negatively affect "characteristic" uses of the Snoqualmie River, a Class A water body. *See* Wash. Admin. Code 173-201A-030(2)(b) (defining characteristic uses for Class A water bodies as including water supply, stock watering, fish and shellfish, wildlife habitat, recreation, and commerce and navigation). One of the conditions

of the WQC involved minimum instream flow. Such a condition is an acceptable application of state and federal antidegradation regulations. *See Pub. Util. Dist. No. 1 of Jefferson County v. Wash. Dep't of Ecology* ("*Jefferson County*"), 511 U.S. 700, 719, 723 (1994).

FERC made compliance with the WQC a condition of the License, as required by § 401 of the CWA. FERC adopted the minimum water flows established in the WQC except for requiring greater water flows during Labor Day weekend. On March 1, 2005, FERC revised the License to require higher minimum flows over the Falls at all times during May and June. These higher minimum flow requirements necessarily result in decreased diversion for use by PSE's hydroelectric project.

[11] Contrary to PSE's claim, the increased minimum flow requirements in FERC's License afford greater—not decreased—protection to the "beneficial uses" protected by Washington's antidegradation statute. Hydroelectric power is not a "beneficial use" protected by Washington's antidegradation policy. In *Public Utility District No. 1 of Pend Oreille County v. State Department of Ecology*, the Supreme Court of Washington construed the term "beneficial uses" to include the enumerated characteristic uses of the water body potentially affected by the proposed project.[5] 51 P.3d 744, 759 (Wash. 2002) (en banc) (citing Wash. Admin. Code 173-201A-030, 173-201A-070); *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986) (stating that the Ninth Circuit "will follow a state supreme court's interpretation of its own statute in the absence of extraordinary circum-

---

[5]Moreover, the Department of Ecology—the agency charged with administering Washington's water quality statutes—interprets the term "beneficial uses" to exclude hydroelectric power generation. Under Washington law, we defer to Ecology's interpretation of a state statute within Ecology's expertise. *See Alvarez v. IBP, Inc.*, 339 F.3d 894, 911 (9th Cir. 2003) (citing *Budget Rent A Car Corp. v. State Dep't of Licensing*, 31 P.3d 1174, 1180 (Wash. 2001) (en banc)).

stances"), *modified at* 810 F.2d 1517 (9th Cir. 1987). Because hydroelectric power generation is not a "beneficial use" of the Snoqualmie River, *see* Wash. Admin. Code 173-201A-030(2), FERC's increased minimum flows do not violate Washington's antidegradation policy or the policies animating the CWA.

**[12]** Whether FERC may impose additional, more stringent requirements above the standards contained in a state's WQC has not been addressed to date by any federal court. *See, e.g.*, *Jefferson County*, 511 U.S. at 723 (refusing to read implied limitations into a § 401 certification on the basis of a theoretical conflict between FERC's authority under the FPA and the state's authority under the CWA). As PSE correctly noted, a federal licensing agency lacks authority to reject WQC conditions in a federal permit. *See Am. Rivers, Inc. v. FERC*, 129 F.3d 99, 110-11 (2d Cir. 1997); *U.S. Dep't of the Interior v. FERC*, 952 F.2d 538, 548 (D.C. Cir. 1992); *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1056-57 (1st Cir. 1982). But FERC did not reject the WQC standards; rather, it incorporated them in its License and strengthened them.

**[13]** We hold that FERC may require additional license conditions that do not conflict with or weaken the protections provided by the WQC. *See Pub. Serv. Co. of Colo.*, 79 F.E.R.C. ¶ 61,148, at 61,631 n.38 (1997)*; Noah Corp.*, 57 F.E.R.C. ¶ 61,170, at 61,601-02 (1991); *Carex Hydro*, 52 F.E.R.C. ¶ 61,216, at 61,769 (1990). FERC's increase in minimum water flows is not contrary to, nor did it weaken, the minimum flow requirements in Ecology's WQC. At multiple points in the relicensing proceeding, Ecology stressed to PSE and FERC that the WQC instream flows would be *minimum*, not maximum, flows. Ecology conveyed that, "[a]s long as FERC requires the minimum instream flow conditions proposed for the 401 water quality certification, we see no conflict between the certification and the license." Implicit in this statement is the conclusion that higher flows would not harm

beneficial uses of the Snoqualmie River. While it might not always be true that mandating higher minimum flows than those in a WQC would be permissible, we think it is permissible in this case.

C

**[14]** Finally, we hold that the FERC decision was supported by substantial evidence and demonstrates that the Commission properly balanced the beneficial public purposes specified in § 10 of the Federal Power Act. The water flow requirements adopted by FERC in the First Rehearing Order were carefully considered during the thirteen-year relicensing proceeding and were included in the option recommended in the final EIS.[6] The final EIS found that Flow Option C, with 1,000 cfs daytime flow for May and June, would meet the widest variety of important objectives among the different flow options considered and would enhance the Falls' cultural value. FERC found that a greater amount of water flow will produce a greater amount of mist, in terms of water particles, which is important to the Snoqualmie Tribe's religious practice. Thus, it was not arbitrary or capricious for FERC to conclude that increasing the minimum flow during May and June to 1,000 cfs would augment the Tribe's religious experience and result in a better balance of interests.

**[15]** The record also demonstrates that FERC carefully weighed the implications of its decision for the Tribe's religious experience against its effect on PSE's bottom line. FERC noted that "the Falls are of great religious significance to the Snoqualmie Tribe, and the level of spray and resulting mist produced by water flowing over the Falls is a critical component of their spiritual experience. . . . [The flows] recommended in the final EIS track the seasonal variation in flows at the Falls, . . . [and] would provide a greater threshold

---

[6]PSE concedes that "careful analysis . . . was undertaken in preparation of . . . FERC's environmental impact statement."

for mist during these months." FERC detailed the costs of the increased flows, which resulted in a $458,000 reduction in the net annual benefit to PSE of $10,953,000, and concluded that "the importance of the mist at this site to the Snoqualmie Tribe" justified "the relatively small effect on net annual benefit." That judgment is not arbitrary or capricious.

## VI

In its decision to relicense the Snoqualmie Falls hydroelectric project, FERC did not violate RFRA or § 106 of NHPA. FERC's adoption of minimum water flows greater than those included in the WQC was not contrary to, and did not weaken, the WQC's minimum flows requirement and was supported by substantial evidence. The parties shall bear their own costs.

**PETITIONS DENIED.**