**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SNOQUALMIE VALLEY PRESERVATION
ALLIANCE,
             *Plaintiff-Appellant,*

            v.                              No. 11-35459

UNITED STATES ARMY CORPS OF              D.C. No.
ENGINEERS,                               2:10-cv-01108-JCC
             *Defendant-Appellee,*           OPINION

PUGET SOUND ENERGY, INC.,
    *Intervenor-Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
May 8, 2012—Seattle, Washington

Filed June 26, 2012

Before: Michael Daly Hawkins, Jay S. Bybee, and
Carlos T. Bea, Circuit Judges.

Per Curiam Opinion

**COUNSEL**

Charles A. Klinge, Groen Stephens & Klinge LLP, Bellevue, Washington, for the plaintiff-appellant.

J. David Gunter II, U.S. Department of Justice, Environment & Natural Resources Division, for the defendant-appellee.

Mark W. Schneider, Perkins Coie LLP, Seattle, Washington, for defendant-intervenor/appellee.

## OPINION

PER CURIAM:

Puget Sound Energy ("PSE") maintains and operates a hydroelectric power plant at the 268-foot-high Snoqualmie Falls in the state of Washington. The Snoqualmie River drains a large watershed above the falls, and all of the water from this area must pass through a single narrow channel before it reaches the falls, creating a bottleneck during heavy rains. This subjects the City of Snoqualmie, located just upstream of the falls, to persistent and significant flooding.

In the process of upgrading and modifying the plant, PSE plans to lower the dam located in the channel above the falls in order to mitigate these upstream flooding problems. PSE has already obtained a license for the project from the Federal Energy Regulatory Commission ("FERC"). Because the upgrade involves discharging fill material into the waters of the United States, which is prohibited under the Clean Water Act ("CWA") without a permit, PSE sought verification from the U.S. Army Corps of Engineers ("Corps") that it could proceed under a series of general nationwide permits ("NWPs") authorizing certain discharges, rather than applying to the Corps for an individual permit. The Corps verified that it could. Downstream property owners formed the Snoqualmie Valley Preservation Alliance ("Alliance") to challenge this decision, which they contend will exacerbate flooding problems below the falls. The district court granted summary judgment for the Corps. For the reasons explained below, we affirm.

I

In 1898, a hydroelectric power plant was first constructed at the falls. PSE proposed an upgrade to the plant in 1991,

which FERC approved in a 2004 license after a lengthy study published in a 1996 Environmental Impact Statement ("EIS"). Both upstream and downstream flooding effects were evaluated in the EIS. On judicial review, we upheld FERC's decision. *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207 (9th Cir. 2008).

Meanwhile, in 2004 the Corps completed a section 205[1] flood control project and published a 1999 Environmental Assessment ("EA") which evaluated the upstream and downstream flooding effects of the project. Because the project implemented slightly different changes related to the falls than those initially planned under the FERC license, PSE applied for an amendment to the license. Under the proposed changes to the project, the existing dam would be lowered by 2 feet and lengthened by 37 feet to match the newly excavated river bank. FERC prepared an EA concluding that the proposed changes would have little effect on flood elevations, and granted the amendment in 2009. *Puget Sound Energy, Inc.*, 127 FERC ¶ 62,174, ¶ 64,482, 2009 WL 1549353, at *10 (2009).

Because completion of the project would involve both temporary and permanent excavation and fill of wetlands, PSE needed a permit under section 404 of the CWA, 33 U.S.C. § 1344. There are two types of section 404 permits: individual permits that authorize specific activities on a case-by-case basis, *id.* § 1344(a), and general permits that provide standing authorization for all activities that fit the description in the permit, *id.* § 1344(e). Individual permits are subject to the requirements of the National Environmental Policy Act ("NEPA"). 33 C.F.R. § 325.2(a)(4). A general nationwide permit, on the other hand, must undergo that extensive process at the time the permit is promulgated, rather than at the time an applicant seeks to discharge fill material under such

---

[1]Section 205 of the Flood Control Act of 1948 is codified at 33 U.S.C. § 701s.

a permit. *Id.* § 330.5(b)(3). Project proponents may usually "proceed with activities authorized by NWPs without notifying the [Corps]." *Id.* § 330.1(e)(1). The Corps does, however, allow permittees to request verification from the Corps that an activity complies with the terms and conditions of a nationwide permit, and in some cases permittees are required do so prior to beginning work under the permit. *Id.* § 330.6(a)(1).

PSE submitted pre-construction notification of its plans to the Corps and sought verification that its activities would be covered under NWPs 33 and 39. In a Verification Letter and accompanying Decision Document, both issued on May 19, 2009, the Corps determined that PSE's activities fell within the scope of three different nationwide permits. First, the removal of the old dam and the construction of the new dam were determined to fall within the scope of NWP 3(a), which authorizes discharges for the replacement of a current structure, including minor deviations. *See* Reissuance of Nationwide Permits, 72 Fed. Reg. 11,092, 11,181 (Army Corps of Eng'rs Mar. 12, 2007).[2] Second, the temporary river diversion for purposes of preparing the work areas was determined to fall within the scope of NWP 33, which authorizes temporary discharges for "necessary . . . construction activities." *See id.* at 11,187. Third, the modifications to the power plant intakes and powerhouse structures were determined to fall within the scope of NWP 39, which authorizes discharges for the "expansion of . . . attendant features that are necessary for the use" of "commercial" and "institutional" buildings. *See id.* at 11,188. The Corps concluded that the project would have minimal individual and cumulative impacts and that it complied with all terms and conditions of NWPs 3, 33, and 39, and imposed a series of special conditions.

The Alliance filed this lawsuit challenging the Verification

---

[2]The Corps originally published the nationwide permits in the Code of Federal Regulations, but since 1996 it has published them in the Federal Register.

Letter. The complaint asserts three causes of action: first, the Corps violated the CWA by authorizing discharges under the nationwide permits rather than requiring an individual permit; second, the Corps violated NEPA by failing to prepare the EA or an EIS required for individual permits; and third, the Corps violated the Administrative Procedure Act ("APA") because its authorization of the discharges was arbitrary and capricious or otherwise not in accordance with the law. PSE intervened in the proceedings as a defendant. On cross-motions for summary judgment, the district court granted summary judgment in favor of the Corps and PSE. This appeal followed.

## II

The district court's grant of summary judgment is reviewed de novo. *Alaska Ctr. for the Env't v. West*, 157 F.3d 680, 682 (9th Cir. 1998). Section 706 of the APA grants jurisdiction to a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, a court may set aside an agency decision that has "entirely failed to consider an important aspect of the problem," *Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010) (internal quotation marks omitted), or failed to articulate a "rational connection between the facts found and the conclusions made," *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004) (internal quotation marks omitted). However, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## III

### A

PSE raises an initial jurisdictional argument which the Corps does not: whether this suit is an improper collateral

attack against the FERC license and amendment. First, PSE argues that the claims made here could, and therefore should, have been raised during judicial review of the FERC license, presumably *Snoqualmie Indian Tribe*, 545 F.3d 1207. Second, citing *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911-12 (9th Cir. 1989), PSE argues that the "practical effect" of a judgment against the Corps in this case would be to "restrain the licensing procedures authorized by FERC."

**[1]** With regard to the first argument, we note that the instant claims against the Corps could not have been raised in the challenge to the FERC license amendment because the Corps had not yet verified that PSE could proceed via general nationwide permits rather than applying for an individual permit. PSE does not contend that the Corps had no role to play in this project, or that obtaining a section 404 permit was an unnecessary step. The Alliance could therefore not have brought any of their present claims in the earlier lawsuit.

**[2]** In support of its second argument, PSE points to the remedies requested by the Alliance, which include requiring the Corps to impose mitigation measures, such as rebuilding the dam to its original height and canceling the plans to widen the riverbank. PSE notes that such remedies would interfere with activities specifically authorized by the FERC license. While this is true, it does not follow that this action is an improper collateral attack on the FERC license. If the Alliance were to prevail, the remedy would be an injunction against the Corps to instruct PSE to apply for an individual permit and to perform a full NEPA analysis of the proposed action. The resulting EIS or EA would have no effect on the validity of FERC's license. The sufficiency of the hypothetical EIS or EA and any additional mitigation measures suggested by the Corps is not before us, nor was it before the district court.

B

**[3]** The Alliance's primary argument on appeal is that hydropower projects may only be authorized if they fall under NWP 17, the only nationwide permit which specifically references hydropower projects. The text of that permit is as follows:

> 17. *Hydropower Projects.* Discharges of dredged or fill material associated with hydropower projects having: (a) Less than 5000 kW of total generating capacity at existing reservoirs, where the project, including the fill, is licensed by the Federal Energy Regulatory Commission (FERC) under the Federal Power Act of 1920, as amended; or (b) a licensing exemption granted by the FERC pursuant to Section 408 of the Energy Security Act of 1980 (16 U.S.C. 2705 and 2708) and Section 30 of the Federal Power Act, as amended.

72 Fed. Reg. at 11,184.

**[4]** The Alliance's argument that hydropower projects can only be authorized under this NWP, or otherwise must undergo the individual permitting process, is not supported by the regulation. NWP 17 affirmatively licenses hydropower projects of less than 5000 kW of generating capacity.[3] It is silent concerning hydropower projects of more than 5000 kW of generating capacity. As the district court found, "[a]lthough NWP 17 is the only general permit specifically referencing hydropower projects, no language contained therein prevents the Corps from applying other permits to hydropower projects that meet those other permits' standards." *Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng'rs*, No. C10-1108, 2011 WL 1215605, at *3 (W.D. Wash. Mar. 30, 2011).

---

[3]It is undisputed that the plant here has over 5000 kW of generating capacity.

The Alliance argues that when the Corps rejected a 1991 proposal to expand NWP 17 to all hydropower plants, it implicitly determined that all hydropower plants above 5000 kW of generating capacity will necessarily have more than "minimal impacts" on the environment and thus must undergo individual review. But this argument ignores the structure and purpose of the nationwide permit system. Each nationwide permit has to undergo the NEPA process when it is promulgated. This process ensures that any activity authorized under that nationwide permit will have "minimal adverse environmental effects." 33 U.S.C. § 1344(e)(1).

**[5]** In 1991, the Corps determined that hydropower plants above 5000 kW of generating capacity should not automatically be determined to have "minimal adverse environmental effects" by virtue of being a hydropower plant above 5000 kW of generating capacity. *See* Final Rule for Nationwide Permit Program Regulations and Issue, Reissue, and Modify Nationwide Permits, 56 Fed. Reg. 59,110, 59,123 (Army Corps of Eng'rs Nov. 22, 1991). This is not a determination that all hydropower plants above 5000 kW of generating capacity must go through the individual permit review process. It simply means that these plants, if they are to qualify at all, must qualify under one of the other nationwide permits. If other nationwide permits apply to the proposed activity, then the Corps has studied the activities falling under that proposed nationwide permit and concluded that they will have "minimal adverse environmental effects."

**[6]** It is not the case, as the Alliance implies, that the Corps is using a shortcut to authorize a large hydropower project that will involve large amounts of discharge into wetlands or rivers. All nationwide permits must comply with general terms and conditions, and many nationwide permits have their own limiting principles. As relevant here, NWP 39 specifies that authorized activities "must not cause the loss of greater than ½-acre of non-tidal waters of the United States." 72 Fed.

Reg. at 11,189.[4] If a hydropower project meets these other limiting conditions, the Corps need not require an individual permit simply because the project's generating capacity is over 5000 kW.

[7] Importantly, this interpretation is consistent with "[t]he agency's longstanding practice." *See Frankl v. HTH Corp.*, 650 F.3d 1334, 1353 (9th Cir. 2011). The Corps articulated this very position in a guidance document in 1992:

> 12.Q. Can an applicant perform an activity under any applicable NWP, even though one may appear to be specific to his proposed activity . . . ?

> 12.A. Although several NWPs may be applicable, an applicant can, at his choice, use any NWP for any activity that meets the terms and conditions of that NWP.

Army Corps of Eng'rs, Qs & As on Nationwide Permits 5-6 (1992), *available at* http://www.usace.army.mil/Portals/2/docs/civilworks/nwp/1992qanda.pdf.[5] Thus, not only is the action taken in this case consistent with the regulation, but it is also in line with agency practice over time. The Alliance's challenge fails.

---

[4]The Project in this case was estimated to impact approximately 0.22 acres. The half-acre-loss limitation also applies to the use of NWP 3 in this case. *See* 72 Fed. Reg. at 11,102 ("If . . . NWP [3] is used with an NWP with a ½ acre limit, such as NWP 39, then the ½ acre limit would apply to the single and complete project.").

[5]The Alliance objects that we should not defer to an informal guidance document that has not undergone full APA review. This argument confuses the issue of deference to a final rule (which is not at issue in this case) with the question of whether an agency has consistently interpreted its own regulations.

## C

The Alliance next argues that even if NWP 17 is not exclusively applicable to hydropower projects, the Corps erred in verifying that NWPs 3 and 39 authorize the project.[6] The verification decision at issue here involves a determination that the proposed activity falls within the parameters of the Corps' regulations enacting the nationwide permits. We "must give an agency's interpretation of its own regulations controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1028 (9th Cir. 2008) (internal quotation marks omitted). The Corps' interpretation in this case is neither.

### 1

[8] NWP 3(a) authorizes discharges from

> [t]he repair, rehabilitation, or replacement of any previously authorized, currently serviceable, structure, or fill, or of any currently serviceable structure or fill authorized by 33 CFR 330.3, provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification. Minor deviations in the structure's configuration or filled area, including those due to changes in materials, construction techniques, or current construction codes or safety standards that are necessary to make the repair, rehabilitation, or replacement are authorized.

72 Fed. Reg. at 11,181. The Corps found that NWP 3 authorized the removal of the old dam and the construction of the new dam at a lower height.

---

[6]The Alliance does not challenge the use of NWP 33, which the Corps also found applicable to the project.

**[9]** This is consistent with the regulation. The old dam is to be "replace[d]" by a new one, and the new structure "is not to be put to uses differing from those uses specified or contemplated for it" originally. That is, the new dam will serve the same purpose as the old dam in the hydropower project; the modifications are meant to ensure better flood control above Snoqualmie Falls. The "[m]inor deviations in the structure's configuration" involve lowering the dam by approximately 11% and lengthening it by approximately 17%.[7] Although the deviations are not precisely meant to bring the project up to date with "current construction codes or safety standards," language in the regulatory history suggests that a general "public safety" rationale suffices to bring a replacement project with minor deviations under this nationwide permit. *See* 56 Fed. Reg. at 59,120 ("[I]t is important to note that . . . concerns for public safety warrant minor deviations for repair and replacement activities."). Protecting the upper valley from excessive flooding rationally qualifies as a "public safety" concern.

2

**[10]** Similarly, both the record and the text of the regulation support the Corps' conclusion that the modifications to the power plant intakes and powerhouse structures fall within the scope of NWP 39. That permit authorizes

> [d]ischarges of dredged or fill material into non-tidal waters of the United States for the construction or expansion of commercial and institutional building foundations and building pads and attendant features that are necessary for the use and maintenance of the structures. Attendant features may include, but are not limited to, roads, parking lots, garages, yards, utility lines, storm water management facilities, and

---

[7]The 18.5-foot-high and 220-foot-long dam will be lowered by 2 feet and lengthened by 37 feet.

recreation facilities such as playgrounds and playing fields. Examples of commercial developments include retail stores, industrial facilities, restaurants, business parks, and shopping centers. Examples of institutional developments include schools, fire stations, government office buildings, judicial buildings, public works buildings, libraries, hospitals, and places of worship. The construction of new golf courses, new ski areas, or oil and gas wells is not authorized by this NWP.

72 Fed. Reg. at 11,188-89. The project here involves the construction of "attendant features that are necessary for the use and maintenance" of the plant. The attendant features are power plant intakes, tailraces, and powerhouses. As described by PSE, this construction is necessary for the improved operation of the hydropower plant.

**[11]** The Alliance objects that "commercial and institutional" structures are limited by the regulation to "stores and buildings," not hydropower projects. This argument fails because the regulation specifically lists "industrial facilities" as an example of "commercial developments." A hydropower plant is plainly an industrial facility. The Alliance's only argument to the contrary relies on its erroneous interpretation of NWP 17. Deferring as we must to the agency's interpretation and application of its own regulations, we conclude that the Corps' decision in this case is consistent with its regulation.

D

The Alliance objects that the Corps' Verification Letter does not contain a sufficient articulation of the basis for its decision. This objection takes two forms. First, the Alliance contends that the Corps' analysis of NWPs 3 and 39 was not articulated in the administrative record, and instead is a mere litigation position. Second, the Alliance challenges the Corps'

determination that the project would comply with all applicable general conditions, arguing that the Corps' conclusory statement that the "[p]roject complies with all terms and conditions of the NWP 3, 33, and 39" is insufficient to pass APA review.

**[12]** It is true that "the agency must articulate a rational connection between the facts found and the conclusions made." *Nat'l Wildlife Fed'n*, 384 F.3d at 1170 (internal quotation marks omitted). The reviewing court " 'may not supply a reasoned basis for the agency's action that the agency itself has not given.' " *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). However, "a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted) (internal quotation marks omitted).

**[13]** The Verification Letter at issue here does state reasons for the action taken: the agency verified that PSE could proceed under section 404 of the CWA because the project had minimal individual and cumulative impacts and it complied with all terms and conditions of NWPs 3, 33, and 39. This conclusion is amply supported by facts in the administrative record. To require more would be contrary to the regulatory scheme, which devised the system of general nationwide permits to streamline the process, reduce redundancy, and conserve agency resources. 33 C.F.R. § 330.1(b) ("Nationwide permits . . . are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts."); *see also Crutchfield v. Cnty. of Hanover, Va.*, 325 F.3d 211, 215 (4th Cir. 2003) ("NWP verification is much simpler than the individual permit process."). The purpose of this scheme is to enable the Corps to quickly reach determinations regarding activities that will have minimal environmental impacts, such as those involving the discharge of less than a half an acre of fill. Requiring an elaborate analysis of the

applicable regulations and the facts would defeat this purpose. *See Orleans Audubon Soc'y v. Lee*, 742 F.2d 901, 909-10 (5th Cir. 1984).

Moreover, a permittee is usually not required to notify the Corps in the first place that it is proceeding under a nationwide permit, except where the applicable nationwide permit specifically so notes. *See, e.g.*, 72 Fed. Reg. at 11,181 (specifically noting that NWP 3(b) requires pre-construction notification, but not requiring notice for activities under the rest of NWP 3, such as 3(a)). And even where pre-construction notification *is* required, a permittee is not required in most cases to supply the Corps with information about how the project will satisfy each general condition. Where there are exceptions to this practice, they are explicitly noted. *Id.* at 11,195 (requiring "documentation demonstrating compliance with the Endangered Species Act" and "documentation demonstrating compliance with . . . the National Historic Preservation Act").

**[14]** Here, NWPs 33 and 39 require pre-construction notification. *Id.* at 11,187-89. PSE accordingly notified the Corps of its project and requested verification. But the general conditions that the Alliance alleges should have been evaluated by the Corps do not place a burden of providing documentation on PSE. Without such documentation, it would be an absurd result to require the Corps to evaluate and explain how PSE will comply with these conditions. Indeed, as part of its decision, the Corps actually reserved its determination of whether the project will comply with all general and special conditions: "In order for this NWP authorization to be valid, you must ensure that the work is performed in accordance with the enclosed *Nationwide Permits 3, 33, and 39 Terms and Conditions* and the following special conditions." The nationwide permit system is designed to streamline the permitting process. We decline to impose a new requirement of a full and thorough analysis of each general condition based on documentation the Corps may or may not have.

E

**[15]** The Alliance bases its NEPA claim on the argument that the Corps was required by the CWA to inform PSE that it could not proceed under general nationwide permits, but instead must apply for an individual permit. However, because the Corps did not violate the CWA, it also did not violate NEPA. Verifying that permittees may properly proceed under a nationwide permit does not require a full NEPA analysis at the time of the verification.

IV

Although the Corps' analysis in this case is brief, it is sufficient to pass judicial review. The Corps' interpretation of its own regulations is entitled to deference, and we affirm the district court's decision.

AFFIRMED.