**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS** October 9, 2013

**TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

SIERRA CLUB, INC.; CLEAN
ENERGY FUTURE OKLAHOMA;
EAST TEXAS SUB REGIONAL
PLANNING COMMISSION,

      Plaintiffs-Appellants,

v.

LIEUTENANT GENERAL THOMAS
P. BOSTICK, in his official capacity
as Commanding General and Chief of
Engineers of the U.S. Army Corps of
Engineers; MAJOR GENERAL
MICHAEL J. WALSH, in his official
capacity as U.S. Army Commanding
General for Civil and Emergency
Operations; COLONEL MICHAEL
TEAGUE, in his official capacity as
Tulsa District Commander of U.S.
Army Corps of Engineers; COLONEL
CHRISTOPHER W. SALLESE, in his
official capacity as Galveston District
Engineer of the U.S. Army Corps of
Engineers; UNITED STATES ARMY
CORPS OF ENGINEERS,

      Defendants-Appellees,

and

TRANSCANADA KEYSTONE
PIPELINE LP; TRANSCANADA
CORPORATION; INTERSTATE
NATURAL GAS ASSOCIATION;
AMERICAN GAS ASSOCIATION;
ASSOCIATION OF OIL PIPE LINES;

No. 12-6201
(D.C. No. 5:12-CV-00742-R)
(W.D. Okla.)

AMERICAN PETROLEUM
INSTITUTE; UTILITY WATER ACT
GROUP,

       Intervenors-Appellees.

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY** and **HOLMES**, Circuit Judges, and **MARTÍNEZ**,[**] District Judge.

---

       Plaintiffs-Appellants Sierra Club, Inc., Clean Energy Future Oklahoma, and East Texas Sub Regional Planning Commission ("Appellants") sued Defendants-Appellees United States Army Corps of Engineers, Thomas Bostick in his official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers, and three other Corps members in their official capacities—Michael Walsh, Michael Teague, and Christopher Sallese—(collectively, "Corps")[1] for

---

[*]     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

[**]     The Honorable William J. Martínez, District Judge, United States District Court for the District of Colorado, sitting by designation.

[1]     TransCanada Corp., TransCanada Keystone Pipeline LP, (collectively, "TransCanada"), Interstate Natural Gas Association, American Gas Association, Association of Oil Pipe Lines, American Petroleum Institute, and Utility Water Act

(continued...)

violations of the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Administrative Procedure Act ("APA") related to the Corps's approval of the construction of an oil pipeline to run from Cushing, Oklahoma to oil refineries along the Gulf Coast near Port Arthur, Texas ("Gulf Coast Pipeline"). Appellants sought a preliminary injunction to prevent construction of the Gulf Coast Pipeline until the resolution of their suit. The district court denied Appellants' request for a preliminary injunction and this interlocutory appeal followed. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we affirm the district court's denial of the preliminary injunction.

## I

The Corps has the authority to issue individual and general permits authorizing the discharge of dredged or fill material into the waters of the United States. *See* 33 U.S.C. § 1344(a), (e). The Corps's regulations set forth the policies and procedures required for the Corps to issue general nationwide permits ("NWPs"). In February 2012, the Corps reissued NWP 12, an NWP that allows, *inter alia*, "the construction, maintenance, or repair of utility lines." Aplt. App. at 264 (77 Fed. Reg. 10,271, issued Feb. 21, 2012).

Also in February 2012, TransCanada announced plans to construct the Gulf

---

[1](...continued)
Group are Intervenors-Appellees in this suit. Because they filed a joint brief with the Corps, our references to "Appellees," for purposes of this appeal, include both the Corps and Intervenors-Appellees.

Coast Pipeline—a 485-mile oil pipeline that was designed to run from Cushing, Oklahoma to oil refineries along the Gulf Coast near Port Arthur, Texas. The Gulf Coast Pipeline was originally proposed as part of a larger oil pipeline ("Keystone XL Pipeline") that was designed to run from Canada to the Gulf Coast. TransCanada submitted pre-construction notifications regarding the Gulf Coast Pipeline to three Corps districts—Galveston, Fort Worth, and Tulsa. The Gulf Coast Pipeline was planned to run through the territory of these three Corps districts, and TransCanada sought verification that its pipeline could proceed under NWP 12. During June and July 2012, each Corps office verified that the Gulf Coast Pipeline could proceed under NWP 12.

Appellants sued the Corps in the United States District Court for the Western District of Oklahoma, challenging the validity of the Corps's reissuance of NWP 12 and the Corps's verification that the Gulf Coast Pipeline could proceed under it. Appellants alleged that these actions violated NEPA, the CWA, and the APA in several respects. They moved for a preliminary injunction, seeking to enjoin the Corps's verifications. The verifications would permit construction of the Gulf Coast Pipeline to commence; it was expected to start in August 2012. Following a hearing, the district court denied Appellants' motion for a preliminary injunction. The district court determined that Appellants did not have a likelihood of success on the merits and that the other equitable factors did not favor granting the injunction. This interlocutory appeal followed.

4

## II

## A

We review the "grant or denial of a preliminary injunction for an abuse of discretion." *Davis v. Mineta*, 302 F.3d 1104, 1110–11 (10th Cir. 2002); *accord Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) (en banc), *petition for cert. filed*, 82 U.S.L.W. 3139 (U.S. Sept. 19, 2013) (No. 13-354); *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012). "An abuse of discretion occurs only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (quoting *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1223–24 (10th Cir. 2008)) (internal quotation marks omitted). "Under an abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1152 (10th Cir. 2012) (quoting *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1235 (10th Cir. 2001)) (internal quotation marks omitted). "We have previously characterized an 'abuse of discretion' as 'an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (quoting

*Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009)), *cert. denied*, --- U.S. ----, 133 S. Ct. 144 (2012).

A party seeking a preliminary injunction must prove that *all four* of the equitable factors weigh in its favor: specifically, prove that "(1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."); *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't Health and Human Servs.*, 724 F.3d 377, 382 (3d Cir. 2013) ("A plaintiff seeking an injunction must meet *all four* criteria, as '[a] plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate.'" (alteration in original) (emphasis added) (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999))), *petition for cert. filed*, 82 U.S.L.W. 3139 (U.S. Sept. 19, 2013) (No. 13-356); *Black Fire Fighters Ass'n v. City of Dall.*, 905 F.2d 63, 65 (5th Cir. 1990) ("The denial of a preliminary injunction will be upheld where the movant has

6

failed sufficiently to establish *any one* of the four criteria." (emphasis added)).

"[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief

must be clear and unequivocal." *Beltronics*, 562 F.3d at 1070 (quoting *Greater*

*Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal

quotation marks omitted); *see Winter*, 555 U.S. at 22 ("[I]njunctive relief [is] an

extraordinary remedy that may only be awarded upon a clear showing that the

plaintiff is entitled to such relief."); *Munaf v. Geren*, 553 U.S. 674, 689 (2008)

("A preliminary injunction is an 'extraordinary and drastic remedy[;]' it is never

awarded as of right." (citations omitted) (quoting 11A Charles Alan Wright et al.,

*Federal Practice & Procedure* § 2948, at 129 (2d ed. 1995))).

## B

Our analysis begins and ends with the third preliminary injunction

factor—that is, whether Appellants' "threatened injury outweighs the injury the

opposing party will suffer under the injunction," *Awad*, 670 F.3d at 1125, or, as

characterized by the Supreme Court, whether "the balance of equities tips in

[Appellants'] favor," *Winter*, 555 U.S. at 20. The district court concluded that the

threatened environmental injuries were outweighed by the financial harm that the

injunction would cause TransCanada.[2] Because we conclude that Appellants have

---

[2] The parties do not dispute that the harm to TransCanada—which was permitted to intervene as of right and without conditions, pursuant to Federal Rule of Civil Procedure 24(a)(2)—is properly taken into account when considering the balance of harms. Accordingly, we need not definitively opine here on whether such consideration

(continued...)

7

not carried their burden of demonstrating that the district court's determination

regarding the balance of harms factor was an abuse of discretion, we affirm the

district court's denial of the preliminary injunction. *See Chem. Weapons Working

Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1489 (10th Cir. 1997) ("We

. . . affirm the district court's denial of Plaintiffs' request for a preliminary

injunction on the basis of its balance of harms finding, obviating the need to

address Plaintiffs' other arguments justifying a preliminary injunction in this

instance."); *see also Herff Jones, Inc. v. Okla. Graduate Servs., Inc.*, 237

F. App'x 384, 388 (10th Cir. 2007) (affirming the denial of a preliminary

injunction solely on the ground that the district court did not abuse its discretion

in determining that the balance of harms weighed against the party pursuing a

preliminary injunction); *cf. Winter*, 555 U.S. at 23–24 (noting that plaintiffs'

---

[2](...continued)
is proper. Arguably, we have previously intimated as much. *See Wilderness Workshop*, 531 F.3d at 1231 (concluding that the district court's balancing of harms that included consideration of the harm to an intervenor was not an abuse of discretion); *Nat'l Indian Youth Council v. Andrus*, 623 F.2d 694, 696 (10th Cir. 1980) (considering the "harm to the defendants and intervenors," and concluding that the "harm to the intervenors [was] impressive"). And, consistent with that view, we have explicitly held that, when a party intervenes as of right pursuant to Rule 24(a), "it becomes a full participant in the lawsuit and is treated just as if it were an original party." *Alvarado v. J.C. Penny Co.*, 997 F.2d 803, 805 (10th Cir. 1993) (quoting *Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985)) (internal quotation marks omitted); *see* 7C Charles Alan Wright et al., *Federal Practice & Procedure* § 1920, at 609 (3d ed. 2007) ("Unless conditions have been imposed, the intervenor is treated as if the intervenor were an original party and has equal standing with the original parties."); *cf. Comanche Indian Tribe of Okla. v. Hovis*, 53 F.3d 298, 303 (10th Cir. 1995) (holding, for the purposes of collateral estoppel, that an individual "became a party in the federal district court once she intervened in the juvenile proceeding," and citing *Alvarado* for this proposition).

failure on the balance of harms factor "*alone* require[d] denial of the requested injunctive relief" (emphasis added)).

The district court determined that the balance of harms favors Appellees. Specifically, it found that the harm an injunction would cause TransCanada was significant—by the time of the August 2012 hearing, TransCanada had spent in excess of $500 million on the pipeline and it was "undisputed that further delay w[ould] cost hundreds of thousands of dollars each day." Aplt. App. at 2001 (Dist. Ct. Order, dated Aug. 5, 2012). Moreover, the district court noted that Appellants did not suggest that "they ha[d] the ability to post a bond to cover any of the irretrievable loss should they ultimately lose." *Id.* Weighing on the other side of the scale were the environmental harms of concern to Appellants. The district court was not impressed by the magnitude of these harms. Specifically, it stated, "In essence, this is all over a loss of waters of the United States of less than one acre . . . over the entire distance of the pipeline," and that Appellants "have failed to show that this project will have more than a minimal impact on the environment." *Id.* at 2002–03. In sum, the court ruled that Appellants had failed to carry their burden of showing that the balance of harms factor tipped in their favor.[3]

---

[3]     We note that, although succinct, the district court's findings were sufficient to allow for meaningful appellate review. Federal Rule of Civil Procedure 52(a) requires a district court, when granting or denying an interlocutory injunction, to make findings of fact and conclusions of law "sufficient to make possible meaningful appellate review."

(continued...)

9

*FTC v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004) (en banc). To comply with Rule 52(a), a district court's findings of fact must be "'sufficient to indicate the factual basis for the court's general conclusion as to ultimate facts' so as to facilitate a 'meaningful review' of the issues presented." *Wolfe v. N.M. Dep't of Human Servs.*, 69 F.3d 1081, 1087 (10th Cir. 1995) (quoting *Otero v. Mesa Cnty. Valley Sch. Dist.*, 568 F.2d 1312, 1316 (10th Cir. 1977)); *see OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1204 (10th Cir. 2007) ("Rule 52(a) does not require the district court to set out its findings and conclusions in excruciating detail. . . . '[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for overelaboration of detail or particularization of facts.'" (quoting Fed. R. Civ. P. 52 advisory committee's note on 1946 Amendments)).

Although the sufficiency of the district court's findings was not raised by either party, we were constrained to inquire regarding the matter, to satisfy ourselves that there is an adequate basis for our review. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1245 (10th Cir. 2001) (noting that we "are compelled to address the issue because, without adequate findings of fact and conclusions of law, appellate review is in general not possible"). And we are satisfied on this score. Although the district court's findings with respect to the balance of harms were not expansive, they were sufficient to comply with its obligations under Rule 52(a). *See id.* at 1246 ("Rule 52(a) does not require 'over-elaboration of detail or particularization of facts' . . . ." (quoting *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1228 (1st Cir. 1994)). The district court identified the harms it thought salient, attributed weight to them, and concluded that the balance did not favor granting an injunction. This is sufficient and consonant with the well-settled principle that the district court "need only make brief, definite, pertinent findings and conclusions upon the contested matters." *OCI Wyo.*, 479 F.3d at 1204 (citation omitted) (internal quotation marks omitted). In contrast, instances where we have concluded that a district court's findings were insufficient for meaningful appellate review frequently have involved a court's mere statement of its ultimate conclusion without an accompanying articulation of the factual basis supporting its conclusion, or a court's complete failure to specifically address a relevant issue. *See, e.g.*, *id.* at 1204–05 (holding that the district court's findings were insufficient because it only stated "*what* [it] found," but not "*why* [it] ruled as it did"); *Pierce*, 253 F.3d at 1245–46 (finding that the district court failed to comply with its Rule 52(a) obligations when it merely stated its conclusion with respect to each of the four preliminary injunction factors); *cf. Aid for Women v. Foulston*, 441 F.3d 1101, 1120–21 (10th Cir. 2006) (finding that the district court abused its discretion because it "did not even evaluate whether there would be irreparable injury," and with respect to the balance of harms, it "did not even identify any

(continued...)

Before us, the Appellants' failure to demonstrate that the district court abused its discretion in balancing the harms, standing alone, is fatal to their cause. In other words, to show that the district court committed reversible error, Appellants had to demonstrate that the court's ruling against them on the balance of harms factor—an essential criterion for obtaining a preliminary injunction—was an abuse of discretion. And Appellants' showing in this regard is woefully deficient. More specifically, Appellants do not expressly maintain that any of the district court's factual findings made in support of its balancing were without support in the record. *See Awad*, 670 F.3d at 1125. Nor do Appellants contend that the district court's balancing of the harms "exceeded the bounds of permissible choice in the circumstances," *Somerlott*, 686 F.3d at 1152 (quoting *Abbott Labs.*, 259 F.3d at 1235) (internal quotation marks omitted), or that it was "arbitrary, capricious, whimsical, or [evinced a] manifestly unreasonable judgment," *Wyoming*, 661 F.3d at 1227 (quoting *Tyson Foods*, 565 F.3d at 776) (internal quotation marks omitted).

Instead, Appellants focus principally on their view of the environmental harms that would flow from construction of the Gulf Coast Pipeline, and they attempt to minimize the harms an injunction would impose on Appellees. For

[3](...continued) possible harm to the Defendants" and only made a "vague" statement regarding the harm to plaintiff).

11

example, relying on the Environmental Impact Statement prepared for the Keystone XL Pipeline, Appellants argue that environmental harms from the Gulf Coast Pipeline include "harm to soils, surface water and groundwater, wetlands, vegetation, wildlife, fisheries, land use, recreation and special interest areas, visual areas, air quality and noise and the significant rise of pipeline spills." Aplt. Opening Br. at 53. On the other hand, with respect to the harm an injunction would inflict on Appellees, Appellants maintain that financial harm, as a general matter, cannot weigh at all, *see id.* at 53 ("Economic harm is not irreparable and does not provide an adequate basis for denying injunctive relief."), and that the specific financial harm of TransCanada should not be accorded appreciable weight because it was "self-inflicted," *see id.* at 54 ("TransCanada's injuries are 'self-inflicted' and it assumed the risk that it would not receive its permits as soon as expected.").

However, as an initial matter, Appellants' assertion that injunctive relief cannot be denied based on a weighing of economic harm is mistaken. The Supreme Court has recognized that financial harm can be weighed against environmental harm—and in certain instances outweigh it. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("And on the other side of the balance of harms was the fact that the oil company petitioners had committed approximately $70 million to exploration . . . which they would have lost without chance of recovery had exploration been enjoined."). Indeed, we too have

12

recognized the appropriateness of weighing financial harm against environmental harm. *See Wilderness Workshop*, 531 F.3d at 1231 (concluding that the district court did not abuse its discretion in according greater weight in the balancing of harms to the public's interest in gas production and also certain financial interests, over the threatened environmental injuries); *see also Davis*, 302 F.3d at 1116 (concluding that "the environmental harms . . . outweigh[ed] the legitimately incurred [financial] costs . . . resulting from an injunction").

In their attempt to minimize the harms a preliminary injunction would inflict on Appellees, Appellants endeavor to challenge the district court's reasoning. After acknowledging that the district court found that TransCanada had already spent over $500 million on the Gulf Coast Pipeline and that the injunction (if implemented) would cost TransCanada significant sums, Appellants have suggested that the district court erred because it "failed to note that TransCanada spent these funds and entered into contracts [to build the Gulf Coast Pipeline] *before* receiving Corps approval."[4] Aplt. Opening Br. at 54. This, say

---

[4]      Appellants also state that the district court erred because it "failed to recognize that TransCanada could mitigate its harm by working on other portions of the project while an injunction prohibited construction in aquatic areas." Aplt. Opening Br. at 12. However, Appellants make no effort to develop this contention of error; they do not mention it again in their briefing. Accordingly, we decline to consider it. *See, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."). Furthermore, in any event, Appellants' observation about mitigation does nothing to directly call into question the district court's undisputed finding that TransCanada already had expended more that $500 million on the pipeline
                                                                                              (continued...)

13

Appellants, makes Appellees' financial harm "self-inflicted" and thus it should not be accorded weight in the balance of harms. Assuming *arguendo* that Appellants' argument amounts to an assertion of legal error, *see* Aplt. Br. at 11 ("The district court committed legal error and abused its discretion in weighing the equities[.]" (initial capitals and underlining omitted)), we find that no such error occurred.

As we discuss below, there is some support in judicial decisions in our circuit and elsewhere for the notion that "self-inflicted" harm should not be accorded weight in the balance of harms. However, Appellants do not direct us to any cases that would cause us on these facts to disregard TransCanada's financial harms as "self-inflicted." Appellants principally rely on *Davis*, where, in assessing the balance of harms, we concluded that much of the financial harm to the state defendants—who opposed the injunction—which was caused by their entry into certain contracts, should not be accorded appreciable weight because it was "self-inflicted." *See* 302 F.3d at 1112–13, 1116. Appellants' reliance on *Davis*, however, is misguided.

A close reading of *Davis* reveals that what led us to brand the state defendants' harm with the "self-inflicted" label, and decline to weigh it, was the

---

[4](...continued)
project by the time of the hearing, and that the injunction, if implemented, would cost TransCanda a great deal of money, running into the hundreds of thousands of dollars per day.

14

fact that the harm-inducing contractual conduct of those defendants, which preceded the decisions of the federal agency defendant sought to be enjoined, was predicated on the federal agency's improper actions, and the impropriety of those actions was attributable to the state defendants. As we characterized the situation in *Davis*, "the state [defendants] involved in this case ha[d] 'jumped the gun' on the environmental issues [to be decided by the federal agency defendant] by entering into contractual obligations that anticipated a pro forma [federal agency] result. *In this sense*, the state defendants are largely responsible for their own harm." *Id.* at 1116 (emphasis added). The state defendants expected a "pro forma result" because they had been knowingly collaborating with the federal agency defendant while it improperly "prejudged the NEPA issues." *Id.* at 1112; *see Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 713 (10th Cir. 2010) (detailing the facts and holding of *Davis*, and noting that *"Davis* indicates that if an agency predetermines the NEPA analysis by committing itself to an outcome, the agency likely has failed to take a hard look at the environmental consequences of its actions due to its bias in favor of that outcome and, therefore, has acted arbitrarily and capriciously").

In other words, defendants' harm-inducing contractual conduct was disregarded as "self-inflicted" in *Davis* (at least primarily) because it was knowingly predicated upon the federal agency defendant's improper or wrongful conduct in predetermining its environmental decisions, and *not* simply because

15

the conduct occurred prior to the federal agency's environmental decisions. In support of this reading of *Davis*, it is noteworthy that the only case that *Davis* cites in support of its "self-inflicted" holding is a decision (in an unrelated commercial context) by the Third Circuit that focused on the wrongfulness *vel non* of the conduct claimed to have produced the financial harm at issue in deciding whether to disregard that harm as "self-serving." *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998); *see also Davis*, 302 F.3d at 1116 (relying on *Pappan Enters.*). In *Pappan Enterprises*, the Third Circuit ultimately declined to disregard the financial harm of the defendants seeking the preliminary injunction as "self-inflicted," because the court could not directly tie the asserted financial harm to any legally cognizable misconduct by defendants. *See Pappan Enters.*, 143 F.3d at 806–07 ("We believe that [defendants'] irreparable injury is not self-inflicted."). In sum, it should not be surprising that, in engaging in the quintessentially equitable task of balancing the harms, we took into account in *Davis* whether the financial harms at issue stemmed from wrongful conduct, in deciding whether they could be properly disregarded as "self-inflicted." *Cf. Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 947 (9th Cir. 2013) ("An injunction is an equitable remedy. While the *Winter* factors 'are pertinent in assessing the propriety of any injunctive relief,' traditional equitable considerations such as laches, duress and *unclean hands* may militate against issuing an injunction that

16

otherwise meets *Winter*'s requirements." (emphasis added) (citations omitted) (quoting *Winter*, 555 U.S. at 32)); *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985) ("Today, 'unclean hands' really just means that in equity as in law the plaintiff's fault, like the defendant's, may be relevant to the question of what if any remedy the plaintiff is entitled to."); *Vaqueria v. Tres Monjitas, Inc.*, 587 F.3d 464, 480 (1st Cir. 2009) ("[W]e are skeptical of those who seek equitable relief when they themselves have engaged in misconduct.").

Viewed in this light, *Davis* is inapposite; there is no suggestion of similar misconduct by TransCanada and the Corps here. In particular, Appellants do not argue that TransCanada entered into contractual arrangements prior to the Corps's approval of the Gulf Coast Pipeline with the expectation that the approval would be "a pro forma result"—that is, the product of the Corps's improper predetermination or prejudgment of the relevant issues. *Cf. Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 n.2 (10th Cir. 2006) (discerning no predetermination because "the agencies had no preexisting agreement with any user group"); *see also Wyoming*, 661 F.3d at 1264 ("Th[e] high standard articulated in *Forest Guardians* makes clear that predetermination is different in kind from mere subjective impartiality." (quoting *Forest Guardians*, 611 F.3d at 714) (internal quotation marks omitted)). Therefore, Appellants' reliance on *Davis* is misguided.

Appellants also support their "self-inflicted" argument with the Eighth

17

Circuit's decision in *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978 (8th Cir. 2011). There, the Eight Circuit held that the district court did not abuse its discretion in balancing the harms in favor of an injunction, at least in part, because the financial harm to the party opposing the injunction was "largely self inflicted." *See id.* at 996–97. That decision, however, is legally and factually distinguishable; accordingly, Appellants' reliance on *Sierra Club* is also misplaced. On the legal front, *Sierra Club* relied exclusively upon *Davis* for its "self-inflicted" harm conclusion. *Id.* at 997. And, as we have discussed, *Davis*'s "self-inflicted" harm holding was principally animated by misconduct concerns that are not present here. Therefore, insofar as *Sierra Club* based its holding on *Davis*, it is legally distinguishable. *Sierra Club* also involved factual circumstances that are markedly different than those found in this case. There, the party opposing the injunction began actual construction of a power plant over one year before a CWA permit was issued and was warned by the Corps that this construction would be done "at [their] own risk." *See id.* at 996–97. In contrast, here, while TransCanada's mobilization for construction of the Gulf Coast Pipeline began prior to the Corps's authorization, the undisputed evidence demonstrates that TransCanada did not begin actual construction of the pipeline until *after* all three Corps offices had approved construction. Accordingly, *Sierra Club* is also factually distinguishable. In sum, although we acknowledge that there is some support in judicial decisions in our circuit and elsewhere for the

18

idea that "self-inflicted" harm should not be accorded weight in the balance of harms, Appellants do not point us to any cases that would lead us to disregard TransCanada's financial harms as "self-inflicted" here.

Consequently, we are essentially left with an argument by Appellants that involves a recitation of the various harms falling on each side of the scale. In our view, such an argument amounts to a tacit request for us to balance the harms anew. This, we will not do. Our focus is properly on whether the district court's balancing of harms manifested an abuse of discretion; simply pointing to evidence in the record that would support a different balancing of the harms is not good enough. *See Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (stating that a party's "argument concerning the balance of harms . . . lacks merit, [because it] effectively rais[es] only a difference of opinion as to outcome").

In other words, when reviewing a district court's balancing of the harms for an abuse of discretion, our charge is only to determine whether the balancing *that the district court performed* was within the range of permissible choices, not whether our own balancing would lead to a different result. *See Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 429 (7th Cir. 2001) ("The question for us is whether the judge exceeded the bounds of permissible choice [in granting or denying a preliminary injunction], not what we would have done if we had been in his shoes." (quoting *Wis. Music Network, Inc. v. Muzak Ltd. P'ship*, 5 F.3d 218, 221

19

(7th Cir. 1993)) (internal quotation marks omitted)); *Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO, Local 2-286 v. Amoco Oil Co.*, 885 F.2d 697, 703 (10th Cir. 1989) ("[Abuse of discretion] review requires that we carefully examine the district court's exercise of its discretion, but 'we may not . . . substitute our own judgment for that of the trial court.'" (omission in original) (quoting *Tri-State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351, 354–55 (10th Cir. 1986)); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393–94 (1992) (O'Connor, J., concurring) (describing appellate review of equitable decrees as "necessarily a task that entails substantial discretion, particularly in a case like this one, where the District Court must make complex decisions requiring the sensitive balancing of a host of factors. As a result, an appellate court should examine primarily the method in which the District Court exercises its discretion, not the substantive outcome the District Court reaches. If the District Court takes into account the relevant considerations . . . and accommodates them in a reasonable way, then the District Court's judgment will not be an abuse of its discretion, regardless of whether an appellate court would have reached the same outcome in the first instance"); *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168–69 (2d Cir. 2001) ("When a district court is vested with discretion as to a certain matter, it is not required by law to make a *particular* decision. Rather, the district court is empowered to make a decision—of *its* choosing—that falls within a range of permissible decisions."); *cf. United States*

20

*v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983) ("A review of the record reveals that although the district court might have issued an injunction, a denial was clearly within its discretion.").

Thus, Appellants have woefully failed to carry their burden of demonstrating how *the district court's* balancing of harms amounted to an abuse of its discretion. That said, in any event, our review of the record suggests that the district court's balancing was well within the bounds of its discretion. The district court concluded that the environmental harm was "minimal"[5] and that the financial harm to TransCanada was significant. Furthermore, the court made specific factual findings to support these conclusions that have clear support in the record, and Appellants do not argue to the contrary. In this regard, we highlight two of the key factual findings. First, we focus on the district court's finding that TransCanada has spent in excess of $500 million on the pipeline and "that further delay will cost hundreds of thousands of dollar each day." Aplt. App. at 2001. Appellees put into the record undisputed evidence that they had already spent $800 million on the Gulf Coast Pipeline and that an injunction would cost them at least hundreds of thousands of dollars per day. *See id.* at 87

---

[5] As Appellants note, the Supreme Court has stated that if environmental harm is "sufficiently likely, . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Vill. of Gambell*, 480 U.S. at 545. But this is merely an observation, not an inexorable mandate. Indeed, in *Winter*, the Supreme Court held that even assuming there were irreparable environmental harms, the district court abused its discretion in finding that they outweighed the Navy's interests in realistic training. *See* 555 U.S. at 23–31.

(Decl. of Robert E. Jones, filed July 9, 2012); *see also id.* at 995 (Decl. of David L. Penning, filed July 31, 2012); *id.* at 1005 (Decl. of Paul E. Fuhrer, filed July 31, 2012).

Second, as for the district court's finding that "this is all over a loss of waters of the United States of less than one acre . . . over the entire distance of the pipeline," *id.* at 2002, we reference the Corps's analysis of the Gulf Coast Pipeline that demonstrated the total permanent loss of waters over the entire length of the pipeline would be 0.68 acres and any other water losses would be temporary. *See id.* at 1728 (noting that 0.63 acres of water will be permanently lost in the Galveston district); *id.* at 1783 (correcting an error in the Tulsa district's original approval letter and noting that 0.05 acres of permanent water loss will occur in the Tulsa district); *id.* at 1821 (noting that there will be no permanent water loss in the Fort Worth district). Thus, there was clear support in the record for these two key district court findings. In sum, because "the district court made specific [factual] findings to support its conclusion [regarding the balance of harms], none of which rises to the level of clear error[,] [t]he court was . . . well within the bounds of its discretion." *Stovall*, 341 F.3d at 1206.

In conclusion, we reiterate that injunctive relief is an extraordinary remedy; a district court should only provide such relief when a party's right to it is clear. *See Winter*, 555 U.S. at 22. When a district court denies this extraordinary remedy, we will overturn its decision only if we have a definite and firm

22

conviction that the decision was outside the zone of permissible choice. *See Somerlott*, 686 F.3d at 1152. Appellants have failed to carry their burden of demonstrating that the district court's determination of the balance of harms factor departed from this zone. This failure ineluctably leads to our affirmance of the district court's decision.

## III

For the foregoing reasons, we **AFFIRM** the district court's denial of Appellants' request for a preliminary injunction.

Entered for the Court

JEROME A. HOLMES
Circuit Judge

12-6201, *Sierra Club et al. v. Lieutenant General Thomas P. Bostick, et al.*

**MARTÍNEZ,** District Judge, dissenting.

In my view, the only prong of the test for injunctive relief that the district court analyzed in sufficient detail to permit meaningful appellate review was the Appellants' likelihood of success on the merits. Because I believe that the district court's analysis of Appellant's likelihood of success on the merits was flawed, and that the record is insufficient to allow the court to affirm on any other basis, I would remand this case to the district court. Therefore, I respectfully dissent.

## I

Appellants contend that the district court erred by concluding that they were not likely to succeed on the merits of their claim. Because it affirms on alternate grounds, the majority does not discuss these arguments, which form the bulk of the issues argued on appeal. As set forth below, I believe that Appellants have shown a likelihood of success on their claims that the failure to conduct an Environmental Assessment or an Environmental Impact Statement for the Gulf Coast Pipeline violated NEPA, and that the Corps' failure to consider the cumulative impact of granting 2,223 approvals of TransCanada's NWP 12 applications violated the CWA and the APA.

### A

NEPA requires federal agencies to consider the environmental consequences of their actions and to allow public participation in the decision-making process. *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305

F.3d 1152, 1162 (10th Cir. 2002) (stating that NEPA "require[s] agencies to consider environmentally significant aspects of a proposed action."). NEPA does not mandate particular substantive results, but rather requires federal agencies to take a "hard look" at the environmental consequences of an action and to disseminate relevant environmental information for public comment so that the general public may be an active participant in the decision-making process. *Citizens' Comm. To Save Our Canyons v. Krueger*, 513 F.3d 1169, 1178 (10th Cir. 2008); *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008) ("NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive limits on agency conduct."). Therefore, NEPA merely guards against "uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

Towards those ends, NEPA requires federal agencies to prepare environmental impact statements ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To comply with NEPA, an agency must first consider whether the proposed action is one that normally requires an EIS, or whether it is categorically excluded. 40 C.F.R. § 1501.4(a). If the agency cannot readily determine whether an action falls into one of these categories, then it must prepare an environmental assessment ("EA"). *Id.* §§ 1501.4(b), 1508.9.

2

An EA is a "concise public document" that "provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or finding of no significant impact." *Id*. § 1508.9(a). The EA must address the direct, indirect, and cumulative impacts of the proposed action. *Id*. § 1508.9(b); *see also id*. §§ 1508.7, 1508.8, 1508.9. If the EA reveals that the project will have a significant effect on the quality of the human environment, then the Corps must prepare a detailed, written EIS. 42 U.S.C § 4332(2)(C). If the agency determines that its proposed action will not have a significant effect on the environment, then it need not prepare an EIS, and may instead issue a Finding of No Significant Impact ("FONSI"). 40 C.F.R. §§ 1508.4, 1508.13. A FONSI must be supported by a statement of reasoning and evidence. *Id*. § 1508.13.

Appellants contend that the Corps violated NEPA by failing to prepare an EA or EIS for the Gulf Coast Pipeline. The Corps first responds by arguing that its NEPA obligations apply only to the adoption of a NWP, and not to the verification of the applicability of a NWP to a particular project. It contends that requiring the full NEPA process at the pre-certification stage defeats the streamlining purpose of the NWP process.

In support of this contention, Appellees rely on *Snoqualmie Valley Preservation Alliance v. U.S. Army Corps of Engineers*, 683 F.3d 1155 (9th Cir. 2012), in which the Ninth Circuit noted that each NWP must undergo a NEPA process when it is promulgated, and that such process "ensures that any activity

3

under that nationwide permit will have 'minimal adverse environmental effects.'" *Id.* at 1160-61.  However, *Snoqualmie Valley* involved the issuance of three NWPs for a single location.  In this case, the Corps approved the use of NWP 12 for *2,227* water crossings.  In my view, this significant distinction makes *Snoqualmie Valley* of little use here.  Given the magnitude of this project, there is little doubt that requiring the Corps to undertake a NEPA analysis at the pre-authorization stage would not defeat the streamlining purpose of the NWPs in general.

The Corps also contends that it only controls permitting of the Gulf Coast Pipeline's water crossings, and that issuance of a NWP at a water crossing is not significant enough to constitute a "major Federal action" and invoke NEPA.  It is well-established that not all construction requiring federal approval becomes "federalized" so as to invoke NEPA.  *See Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 270 (8th Cir. 1980).  With this in mind, the Department of the Army has adopted regulations to provide guidance as to when a project falls under NEPA.  *See* 33 C.F.R. Part 325, app. B.

These regulations have particular provisions that apply when the regulated activity is a link in the overall project, such as the pipeline at issue here.  *Id*. § 7(b).  This section of the regulations provides that, in determining the scope of a project, the Corps must consider not only the specific activity which requires a Department of the Army permit, but also "any other portion of the project that is

4

within the control or responsibility of the Corps of Engineers (or other Federal

agencies)." *Id*. § 7(b)(3). The regulations provide the following examples:

> For example, a 50-mile electrical transmission cable crossing a 1 1/4 mile wide river that is a navigable water of the United States requires a DA permit. Neither the origin and destination of the cable nor its route to and from the navigable water, except as the route applies to the location and configuration of the crossing, are within the control or responsibility of the Corps of Engineers. Those matters would not be included in the scope of analysis which, in this case, would address the impacts of the specific cable crossing.
>
> Conversely, for those activities that require a DA permit for a major portion of a transportation or utility transmission project, so that the Corps permit bears upon the origin and destination as well as the route of the project outside the Corps regulatory boundaries, the scope of analysis should include those portions of the project outside the boundaries of the Corps section 10/404 regulatory jurisdiction. To use the same example, if 30 miles of the 50-mile transmission line crossed wetlands or other "waters of the United States," the scope of analysis should reflect impacts of the whole 50-mile transmission line.

*Id*.

The Gulf Coast Pipeline is 485 miles long, and required the Corps to issue

2,227 permits for water crossings. This means that the Gulf Coast Pipeline

crosses United States waters almost five times in each mile, or about once every

1150 feet. As such, the Gulf Coast Pipeline is much more comparable to the

second example set forth in the cited regulations—which requires consideration of

the entire transmission line—than the first.

5

Applying these regulations, a district court in Texas has held that the Corps was required to consider the impact of the entire 900 mile pipeline, and to prepare an EA or EIS for the project. *See Spiller v. Walker*, 1998 U.S. Dist. LEXIS 18341 (W.D. Tex. 1998). The court considered the cumulative impact of the involvement of all federal agencies and noted that "the federal government controls the entire pipeline process: construction, operation and safety inspection, sales of the petroleum products, and accident cleanup. It is not only arbitrary and capricious to assert this combination of actions is not major Federal action, but it blatantly flies in the face of common sense." *Id*. at *52. The *Spiller* court also held that the Corps' role in granting a number of permits for construction has "such a crucial impact on the construction of the . . . Pipeline at so many points along the pipeline that it can only be described as 'major Federal action.'" *Id*. at *40-41.

Considering the number of permits issued by the Corps relative to the overall size of the Gulf Coast Pipeline, it is patently ludicrous for Appellees to characterize the Corps' involvement in the subject project as minimal, or to maintain that the Corps' permitting involves only a "link" in the Gulf Coast Pipeline. As the Ninth Circuit has held:

> Although the Corps' permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project. Put another way, while it is the development's impact on jurisdictional waters that determines the scope

6

> of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility. The Corps' responsibility under NEPA to consider the environmental consequences of a permit extends even to environmental effects with no impact on jurisdictional waters at all.

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2005).

Given the totality of the circumstances in this case, I believe the Corps' involvement in the Gulf Coast Pipeline was a "major Federal action" that required a comprehensive NEPA analysis for the project. Therefore, in my judgment the Appellants have shown a likelihood of success on the merits with respect to their claim that the failure to prepare an EA or EIS for the Gulf Coast Pipeline was a violation of NEPA.

**B**

In their as-applied challenge to the approval of the Gulf Coast Pipeline, Appellants argue that the Corps violated the conditions of NWP 12 by failing to adequately consider the cumulative impact of approving the use of the NWP 12 2,227 times for the project.

NWP 12 requires that the Corps' verification of a project for which a pre-construction notice is filed (as there was in this case) must "include an evaluation of the individual crossings to determine whether they individually satisfy the terms and conditions of the NWP(s), as well as cumulative effects caused by all of the crossings authorized by NWP." The Gulf Coast Pipeline passes through three Corps' districts—Galveston, Fort Worth, and Tulsa—and

7

pre-construction notifications were filed in each. Each of these districts issued a brief letter authorizing the proposed action. Appellants contend that none of these three verifications takes into consideration (or, indeed, do any of them even reference) the sections of the pipeline in the other two Corps districts. Of even greater import, Appellants argue, is the fact that none of these administrative letters consider the cumulative impacts of the entire project as a whole. As a result, Appellants contend, the Corps violated NWP 12 in this case.

In response, the Corps contends that its verification letters were sufficient because they set forth the applicable legal standard, which includes a cumulative impacts assessment, and states that the Corps made a "determination" that all conditions were satisfied. Aple. Response Br. at 42. The Corps acknowledges that the verification letters are terse, but contends that an agency is not required to recite its findings in any particular form. The Corps also contends that, even if the explanation in the letters is insufficient, any such error is immaterial because the record shows that the cumulative impact of the Gulf Coast Pipeline would be minimal.

"Because the arbitrary and capricious standard focuses on the rationality of an agency's decision-making process rather than on the rationality of the actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994) (quoting *Motor Vehicle Mfrs. v. State*

8

*Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983)). "Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record." *Colorado Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006). The record of decision created by the agency must make plain its course of inquiry, its analysis, and its reasoning. *Id.* "After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles." *Id.* If the agency has failed to provide a reasoned explanation for its action, or if limitations in the administrative record make it impossible to conclude the action was the product of reasoned decision-making, the reviewing court cannot simply affirm. *Olenhouse*, 42 F.3d at 1575.

The letters of approval prepared by each district do not provide a reasoned basis for *any* cumulative impacts analysis. Despite the Corps' contention to the contrary, the law is clear that the agency cannot simply state the legal standard and then recite that it made a "determination" that such criteria were satisfied. *See Hull v. I.R.S.*, 656 F.3d 1174, 1177-78 (10th Cir. 2011) (agency's explanation "will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping."); *see also Siddiqui v. Holder*, 670 F.3d 736, 745 (7th Cir. 2012) ("the recitation of governing law does not excuse the AAO from its obligation to apply the law to the facts of each case."); *U.S. Lines Inc. v. Fed. Maritime Comm'n*, 584 F.2d 519, 535 (D.C. Cir. 1978) (deference to the agency is inappropriate under the arbitrary and capricious

9

standard when the agency "does not set forth convincing reasons for its determination in sufficient detail to allow the validity [of its decision] to be determined.").

Recognizing the deficiency in the administrative record with regard to the cumulative impacts analysis, the Corps attempts to rely on affidavits presented to the district court stating that the Districts conferred with each other regarding the cumulative impacts. But this manner of tactical litigation maneuvering—of creating a *post hoc* evidentiary record before the trial court that was clearly missing in the record before the administrative agency—has been soundly rejected by both this court and the Supreme Court. *See Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 419 (1971) (barring agency from relying on affidavits containing "*post hoc* rationalizations" for its actions that were created during the litigation process); *Lewis v. Babbitt*, 998 F.2d 880, 882 (10th Cir. 1993) (district court reviewing an agency action "may not rely on litigation affidavits that provide *post hoc* rationalizations for the agency's action").

Rather, "the agency's action must be reviewed on the basis articulated by the agency and on the evidence and proceedings before the agency at the time it acted." *Am. Min. Congress v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985); *see also Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001) ("[T]he required explanation must be articulated by the agency at the time of its action."). "The integrity of the administrative process must be judged by what

10

took place in the administrative proceedings as reflected on the administrative record unaided by affidavit proof in the reviewing court." *Garvey v. Freeman*, 397 F.2d 600, 610-11 (10th Cir. 1968) (citations omitted); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994) ("[T]he grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record.").

In this case, the Corps failed to sufficiently articulate its reasoning for concluding that the authorization of 2,227 uses of NWP 12 to construct the Gulf Coast Pipeline would cause only minimal cumulative impact. There is no mention in the administrative record of any collaboration between the Districts with regard to the cumulative impact of the entire length of the Gulf Coast Pipeline. There are also no specific findings in support of the Corps' conclusion that the Gulf Coast Pipeline, as a whole, would have minimal cumulative impact. The failure to consider the cumulative effects of all of the water crossings involved in the Gulf Coast Pipeline violates the terms of NWP 12, and, therefore, the approval of the use of NWP 12 for construction of the Gulf Coast Pipeline violated the law. *See* 33 C.F.R. § 330.1(c) ("An activity is authorized under an NWP only if that activity and the permittee satisfy all of the NWP's terms and conditions.").

Therefore, in my view, the Appellants have shown a likelihood of success

11

on the merits with respect to their contention that the Corps violated the APA and the CWA when it authorized construction of the Gulf Coast Pipeline through approval of the 2,227 issuances of NWP 12.

## II

As set forth above, I find that Appellants have shown a likelihood of success on the merits and, therefore, have satisfied their burden with respect to the first prong of the standard for injunctive relief. However, to prevail on their motion for preliminary injunctive relief, Appellants are required to show, not only that they were likely to succeed, but also that they would suffer irreparable injury, that the balance of the harms tipped in their favor, and that an injunction would not be adverse to public interest. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). Because I find that the district court did not adequately address any factor other than likelihood of success on the merits, I would remand to the district court for further proceedings. *See Downie v. Indep. Drivers Ass'n Pension Plan*, 934 F.2d 1168, 1171 (10th Cir. 1991) (remanding where "the absence of findings leaves us with no means by which to judge the exercise of the court's discretion.").

The district court's order denying Appellant's motion for temporary restraining order is sixteen pages long. Of this, more than twelve pages are devoted to whether Appellants were likely to succeed on the merits. After

concluding that Appellants had not shown a likelihood of success on the merits, the district court stated: "As a result of the above, the Court finds that Plaintiffs have failed to establish they are entitled to injunctive relief under Rule 65(a). The Court would be remiss, however, if it did not address the equities in this case." Aplt. App. at 2001 (Dist. Ct. Order, dated Aug. 5, 2012). The district court's discussion of the remaining three equitable factors is a mere three paragraphs in length, it is bereft of any meaningful legal analysis of the issues presented, and does not contain any factual or legal citations. I believe this remarkably cursory discussion is insufficient to permit meaningful appellate review, particularly under the relevant abuse of discretion standard.

As the majority points out in a lengthy footnote, Rule 52(a) does not require the district court to set out its findings and conclusions in excruciating detail. *See* Fed. R. Civ. P. 52, Notes of Advisory Committee on 1946 Amendments ("the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for overelaboration of detail or particularization of facts."). On the other hand, this Court has "cautioned that too little detail frustrates meaningful appellate review by requiring the parties and this court to guess at why the district court reached its conclusion." *OCI Wyo., L.P. v. Pacificorp*, 479 F.3d 1199, 1204 (10th Cir. 2007). A district court is required to recite "as many of the subsidiary facts as necessary

13

to permit us to determine the steps by which it reached its ultimate conclusion." *Roberts v. Metro. Life Ins. Co.*, 808 F.2d 1387, 1390 (10th Cir. 1987) (citing *Snyder v. United States*, 674 F.2d 1359, 1363 (10th Cir. 1982) (internal quotations omitted).

The majority holds that the district court's analysis of the balance of the equities satisfies Rule 52(a) because it "identified the harms it thought salient, attributed weight to them, and concluded that the balance did not favor granting an injunction." Maj. Op. at 10, n.3 (quoting *OCI Wyo.*, 479 F.3d at 1204). I believe the majority has overstated the district court's findings. The district court simply noted the substantial cost to TransCanada if construction of the Gulf Coast Pipeline is delayed, compared to its finding that allowing the Pipeline to proceed would have "minimal impact on the environment." Aplt. App. at 2002 (Dist. Ct. Order, dated Aug. 5, 2012).

In its brief discussion of the equities, the district court included no discussion of the irreparable nature of environmental injury in general or the fact that, where such injury has been alleged, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."); *Catron Cnty. Bd. of*

14

*Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1440 (10th Cir. 1996) ("An environmental injury usually is of an enduring or permanent nature, seldom remedied by money damages and generally considered irreparable.").

Moreover, the district court focused on only the permanent loss of waters that would result after construction of the Gulf Coast Pipeline was complete, and failed to address the real and significant harm caused by the actual construction of the pipeline, including the clearing of trees and vegetation, removing topsoil, filling wetlands, building access roads, and clearing an eighty-five foot construction right-of-way for the length of the pipeline.

The district court's balancing of the harms also completely ignores the fact that TransCanada **chose** to incur its economic harm by entering into contracts for services before the Gulf Coast Pipeline was approved, even in light of the controversial nature of the Pipeline. *See Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002) (finding that balance of the harms weighed against the state defendants who "'jumped the gun' on the environmental issues by entering into contractual obligations that anticipated a *pro forma* result."); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 2001 WL 1739458 (10th Cir. Nov. 16, 2001) (holding that state was at fault for its harm when it was aware of controversial nature of the project and chose to enter into contractual obligations nonetheless).

For these reasons, I believe the district court's analysis with respect to the

15

equitable factors other than likelihood of success on the merits is insufficient for us to determine whether the district court properly exercised its discretion in this regard. Notably, the district court was operating under incredibly difficult circumstances in that Appellants' Motion for Temporary Restraining Order and Preliminary Injunction was filed only weeks before construction on the Gulf Coast Pipeline was set to commence. As a fellow district court judge, I appreciate the attention that the district court gave this case under nearly impossible time constraints. In light of its finding that Appellants had not met their burden with respect to likelihood of success on the merits, there was no need for the district court to analyze the remaining three equitable factors. However, because I would find that Appellants have shown that they are likely to succeed on the merits, it would become necessary on remand for the district court to consider the remaining equitable factors. Moreover, in my view the district court should have the opportunity to undertake this assessment and analysis in the first instance. *See Kikumua v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (remanding for consideration of the public interest and balancing of interests because the district court had not discussed them); *see also Flexible Lifeline Sys., Inc. V. Precision Lift, Inc.*, 654 F.3d 989, 1000 (9th Cir. 2011) ("We believe the better course is to remand to allow the district court to make the requisite factual determinations regarding irreparable harm and apply those factual findings to the

16

four-factor framework to determine whether injunctive relief is warranted."); *Lankford v. Sherman*, 451 F.3d 496, 513 (8th Cir. 2006) (remanding where district court only considered likelihood of success on the merits because "[t]he district court is in the best position to evaluate all of the evidence and weigh the factors to determine whether the injunction should issue.").

The majority's discussion on the balancing of harms usurps the district court's role not only as the fact-finder, but also as the court which should initially be exercising its discretion to determine whether injunctive relief is appropriate. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006) (vacating the decision of the court of appeals and ordering a remand so that the district court could address the equitable elements of a preliminary injunction); *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 811 (Fed. Cir. 2007) ("If we were to weigh the evidence ourselves to reach a conclusion on injunctive relief, we would effectively be exercising our own discretion as if we were the first-line court of equity. That role belongs exclusively to the district court. Our task is solely to review the district court's decisions for an abuse of discretion. "); *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437-38 (7th Cir. 1986) (remanding to the district court for consideration of the equitable elements of a preliminary injunction because "the appellate process is not well suited to an appreciation of the subtle shadings of a case" involved in the balancing of equities).

17

**III**

Given my conclusion that the district court abused its discretion in finding that Appellants did not meet their burden of showing a likelihood of success on the merits, I would reverse the district court's denial of the Motion for Temporary Restraining Order and Preliminary Inunction, and remand with instructions that the district court determine in the first instance whether Appellants have met their burden with respect to the remaining three equitable factors.